## Belle Lesher, Appellant, v. Jacob H. Lesher, Appellee.

### Gen. No. 15,113.

1. MARRIAGE—*public policy as to common law marriages.* The public policy of this state is against common law marriages.

2. MARRIAGES—*what essential to establish common law.* Where the relation between a man and a woman living together is illicit in its commencement, it is presumed to so continue until a chånged relation is proved. Without proof of a subsequent actual marriage, such marriage will not be presumed from continued cohabitation and reputation of the relation between them, which was of illicit origin.

Bill for separate maintenance. Appeal from the Circuit Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed January 13, 1911.

**Statement by the Court.** In this case appellant filed a bill in January, 1908, against appellee in the Circuit Court of Cook county, praying for a separate maintenance. An answer was filed, denying the marriage, and stating, among other things, that on the 7th day of August, 1907, appellee was lawfully married to one May Charter, with whom he has lived and cohabited, and was then living and cohabiting, as her husband. The answer further stated that the complainant and defendant never sustained the marriage relation toward each other, nor was the subject of marriage between them ever discussed or mentioned during the entire course of their acquaintance, nor did the defendant ever introduce complainant as his wife, nor was he introduced by her as her husband.

After a full hearing in July, 1908, the court below found for the defendant, and dismissed appellant's bill for want of equity.

Appellant does not claim to be the wife of appellee by virtue of any marriage ceremony, but bases her right upon an alleged common law marriage.

It appears that the parties became acquainted in

1898 or 1899, and almost immediately thereafter be-ban to sustain illicit relations with each other,—rooming and living together in hotels and flats, for several years. And though appellant claims a marriage between herself and appellee on the 21st day of September, 1901, yet, to all outward appearance, their relationship remained the same during the entire period from 1898 until 1907. During all of this time, they carefully kept from their relatives and from their friends all knowledge of their relations toward each other, and when, for a few weeks, they lived in the home of a friend and acquaintance of appellee, their sexual relations ceased during the period, notwithstanding the fact that it was some time after the alleged common law marriage had taken place.

Appellant, while thus living with appellee, had received two anonymous letters, informing her that if she did not discontinue her relations with appellee, the writer would inform her father—a reputable man residing in Minnesota; whereupon, appellant says, she told appellee she would have to do something to square herself with her father. It was then arranged that she would actually marry some man. Afterwards, and some time in the year 1901, she did actually go through a marriage ceremony with one Frank Ellsworth, from whom she proceeded forthwith to secure a collusive divorce, and she continued her former relations with appellee.

Appellant afterwards visited her father at his home in Minnesota, and while there exhibited to him the marriage certificate, showing her marriage with Ellsworth, and this was done she says so that, when her father heard of her living with appellee, he would suppose it to be the husband shown by the marriage certificate. Appellant claims that while thus visiting her father and her early friends and associates, she received an inspiration to better living, and determined to live thereafter a pure life; however, upon her re-

turn to Chicago she very shortly went back to the old life with appellee.

The early acquaintance of the parties was mutually sought by them for the purpose of enjoying lascivious pleasures with each other, and it is practically conceded that these relations continued with mutual satisfaction for several years.

Appellant claims that a marital agreement was made between her and appellee on the 21st day of September, 1901, by which she became and was thereafter his lawful wife. In describing the alleged agreement she says:

"Harry said he would settle this marriage question for all time to come. He says we love each other, Nellie, and we will be married, and he asked me if I loved him well enough to take him for a husband, and I said, 'Yes I do,' and he said he loved me well enough to take me for his wife, and he would from now on take me for his wife, and I should from now on take him for a husband, and I said 'Yes,' and he took me in his arms and kissed me and told me that was a common law marriage, but it was just as legal as any could be."

By her statement it appears that this agreement was made in the secrecy of their room with no witnesses present. Appellee positively and unequivocally denies any such agreement or occurrence. In any event it does not appear that there was any change in the conduct of the parties either toward each other or toward the public, following this alleged marriage, but, to all outward appearance their relation was as much that of husband and wife before the alleged marriage as it was afterward. Appellant admits that the marriage was kept secret, but claims that this was done because appellee requested it, saying that he couldn't explain everything,—that his brother John had something over him, and she made no investigation to determine the truth or falsity of these representations.

The parties made many trips together, occupying the same apartments at the various hotels and other places, but never registering under their right names. Appellant made several trips during the time they lived together, including one to Alaska, one to Cuba and one to Europe. While on these trips the parties exchanged letters. In none of the letters from appellant to appellee which were shown upon the trial did she make the slightest allusion to the marriage relation. She testified that, in some of his letters to her he did refer to her as his wife, and in some signed himself as her husband, but she did not produce any letters written by him, claiming that she had destroyed them.

ALBERT H. FRY and RUSSELL M. WING, for appellant.

ELMER D. BROTHERS, for appellee.

MR. JUSTICE BALDWIN delivered the opinion of the court.

The important, and practically the only, question in this case is whether the court below was by the evidence justified in denying appellant's contention that she was the common law wife of appellee, and in holding that the relations between them were meretricious instead of marital.

We shall not discuss at length the evidence in the case. The alleged agreement, to which appellant testified, is so explicit and precise,—so free from any possible legal criticism because of any deficiency or imperfection in it as to itself raise serious doubts whether any such occurrence took place. The appellee expressly denies it. If the story is untrue, he is the one person who could deny it, for none beside these two were present. Moreover, the reason given by appellant for allowing the alleged marriage to be kept secret does not seem adequate. If that reason

existed she could probably have offered some evidence of it other than her unsupported word. In any event, it does not appear that the alleged private marital agreement altered appellant's situation any in any public way. Whatever their relations to the public and to each other were previously, they continued to be.

Public policy in this State, as evidenced by the opinions of our courts, as well as by legislation, is opposed to common law marriages. In 1905, the State legislature of Illinois, in the interest of public morals, prohibited common law marriages after that date.

It has long been the law that, where the relation between a man and a woman living together is illicit in its commencement, it is presumed to so continue until a changed relation is proved. Without proof of a subsequent actual marriage, such marriage will not be presumed from continued cohabitation and reputation of the relation between them, which was of illicit origin. Cartwright v. McGown, 121 Ill. 388.

Nor will the law or public policy permit the converting of meretricious relations into the sacred relation of husband and wife. In re Estate of Maher, 204 Ill. 31.

In this case we are satisfied, from a careful consideration of all the evidence, that appellant deliberately assumed meretricious relations with appellee, and that there is an utter failure to establish any changed relationship, or actual marriage between the parties.

We think it clear, therefore, that the court below was right in entering a decree dismissing the appellant's bill for want of equity.

The decree is, therefore, affirmed.

*Affirmed.*